### ALIENATION OF HUSBAND'S AFFECTIONS.

Superior Court of Cincinnati.

MARGARET BINDER v. AMELIA BULLER.

Decided, January, 1914.

*Husband and Wife—Abandonment of Wife Not Necessary to Entitle Her to Maintain an Action for Alienation of Her Husband's Affections.*

An action may be maintained by a wife against another woman for the alienation of her husband's affections, without proof of actual separation, if it be shown that there has been a loss of the consortium.

*E. P. Bradstreet,* for plaintiff.
*Joseph B. Derbes,* contra.

OPPENHEIMER, J.

The petition in this case alleges that "defendant secretly, stealthily and maliciously pursued plaintiff's husband * * * and wickedly, purposely and maliciously sought to win his affections and love from plaintiff * * * and appropriate the same to herself." It further alleges that defendant "did * *

*  wickedly, maliciously and knowingly seduce plaintiff's said
husband  *  *  *  whereby  defendant  destroyed  plaintiff's
peace and happiness, alienated her husband (*sic*), broke up her
home, and deprived her of the love, affection and peaceful con-
sortium of her said husband.''

To this petition defendant demurs upon the ground that it
does not state facts sufficient to constitute a cause of action.

The petition is, to say the least, a bit disappointing to us.
It starts out bravely enough, but weakens perceptibly toward the
end.   It does not boldly charge that defendant succeeded in her
nefarious purpose—perhaps plaintiff's pride would not permit
her to make such an assertion.   It states merely that defendant
"*sought* to win" the affection and love of plaintiff's husband,
leaving at first the inference that plaintiff may still possess them
in all their pristine purity. But, we are then informed, plaintiff's
peace and happiness have been irreparably destroyed by defend-
ant's machinations, her home "broken up," her husband "alien-
ated," and the "love, affection and peaceful corsortium" of her
husband irrevocably lost to her, and her spiritual misery can
be mollified only by the payment of material dollars.

Upon examining this subject, we are forcibly struck by the
fact that at common law a gross inequality existed in the rela-
tive rights of the male and female.   We have frequently heard
that the laws were made by and for man, and that the "female
of the species" who, in the language of Kipling is "more deadly
than the male," was invariably kept in subjection.   Her rights
and privileges were uniformly curtailed, while those of man were
enlarged and protected.   Husband and wife were one—but he
was *the one*.   However, in the matter of alienating affections,
the rule seems to have been inexplicably reversed.   If a man
stole the love of his neighbor's wife, the heavy hand of justice
was swift to descend upon him and transfer to the bereft hus-
band a substantial portion of his available assets.   But a woman
might lay siege to the heart of a married man and capture it with
impunity.   Of course, this disparity of privilege was manifestly
unjust and inequitable, but it was the law—the *man-made* law

(*Lynch* v. *Knight,* 9 H. L. C., 577). It is only proper to notice, however, that it does not seem to have been the divine law, for if the Bible is to be trusted, David's ravishment of Uriah's wife was deemed but a venial fault; while if Joseph had been a wedded man public sentiment would doubtless have supported his wife in an action against Mrs. Popiphar for attempted seduction—though it is scarcely in accord with modern criminal law to condemn a woman upon the uncorroborated testimony of a man who is seeking to exculpate himself.

At common law, then, it seems that a wife could not maintain an action for the alienation of her husband's affections because (1) she had no *property right* in them (*3 Blackstone Comm.,* 143), and (2) she could not sue alone, and it was not seemly that the husband be permitted to join with her to redress a wrong in which he was a participant (*Bassett* v. *Bassett,* 20 Ill., App., 543). The language of Blackstone is somewhat significant: "The inferior hath no kind of property in the company, care or assistance of the superior, as the superior is held to have in those of the inferior, and therefore the inferior can suffer no loss or injury." (It is noteworthy that this language comes from England, the birth-place of the militant suffragette.)

Modern statutes enabling married women to sue generally, and securing to them property rights, have done away with this disability, and established the wife's "property right" in her husband's companionship and affections, and her authority to maintain a separate action for the invasion of that right. Section 11245 of the General Code of Ohio gives to a married woman the same rights she would have in this respect if she were unmarried.

Thus in the case of *Seaver* v. *Adams,* 66 N. H., 142, in which it is held that a married woman may maintain an action against another woman for the seduction of her husband, the court expresses itself in this vigorous language:

"As the only reason why a wife formerly could not maintain an action for the alienation of her husband's affections was the barbarous common-law fiction that her legal existence became suspended during the marriage and merged into his   *   *   *

there remains now not the semblance of a reason why such an action may not be maintained here."

In our own state, the Supreme Court has likewise spoken in no unmistakable terms. In *Westlake* v. *Westlake*, 34 O. S., 621, Chief Justice Gilmore, after reviewing the early English cases, recites the several legislative acts in this state, and says:

"This legislation, in effect, abolishes the common law unity of person in husband and wife, so far as that unity is represented solely by the husband, and in its stead introduces a rule analogous to that of the civil law, by which the wife is so far regarded as a distinct person, that she may have her separate property, contracts, credits, debts, and injuries growing out of a violation of any of her personal rights, all of which shall be and remain under her sole control; and in matters concerning them, or any of them, she may sue or be sued alone."

If, then, the wife has the same right of action as a husband in such cases, the question is naturally presented, whether the husband might, under such circumstances as those set out in the petition herein, maintain an action for the alienation of the wife's affections. Defendant contends that there is no allegation in this case that plaintiff has been separated from her husband, and that in fact no such separation has taken place, but that she is still residing with him and that he is still supporting her.

As there seems to have been no determination of this question in this state, we have been compelled to examine the question generally for the purpose of determining both the weight of authority and the advisability of following it.

In *Bigelow on Torts*, Eighth Edition, 277, it is said:

"It is  *  *  *  unnecessary that there should be any separation or pecuniary injury; in which respect the action resembles that of a parent for the seduction of his daughter."

In *Bishop on Marr., Div. & Sep.,* Section 1361, it is said:

"One who, by improper means, alienates a wife's affections from her husband, though she neither leaves him nor yields her

person to the seducer, injures the husband in that to which he is entitled—brings unhappiness to the domestic hearth, renders her mere services less efficient and valuable, and inflicts on him a damage * * * so that for the redress of this wrong an action is maintainable.''

In the case of *Rhinehart* v. *Bills*, 82 Mo., 534, which holds that an action is maintainable by the husband without proof that the wife has been induced to leave him, the court says:

''The injury to defendant consists in the alienation of his. wife's affections with malice or improper motives. Debauchery and elopement, when they occur, are only the immediate and legitimate consequences of the wrong. * * * The alienation of the wife's affections for which the law gives redress, may be accomplished notwithstanding her continued residence under her husband's roof. Indeed it has been not infrequently re-marked by authors and jurists that such continued residence after the alienation has been effected, so far from leaving the husband without a good cause of action, contributes an aggravation to his injury, from which an elopement might well be accepted in the nature of an alleviation.''

The same rule is applied in the case of *Heermance* v. *James*, 47 Barb., 121, where it is said:

''Her actual presence with him, under such circumstances, maintaining and exhibiting towards him such feeling, could afford him no relief, but would rather add the provocation of insult to the keenness of the injury inflicted; it would continue before him a present, living, irritating, aggravating, if not consuming source of grief, which her absence might in a measure relieve.''

It seems that in all such cases the gist of the action is the loss of consortium, which is said to include ''society, companionship, conjugal affections, fellowship and assistance.'' Manifestly, all these may be absent despite the mere physical presence of the wife. And so equality of right would demand that the wife be likewise entitled to the conjugal society of her husband and that she be given the same remedies against one who might deprive her thereof. Modern views of the marriage ceremony would

not tolerate any other idea. It is no longer supposed that she requires the protection of the law to any greater extent than the husband, but she is manifestly entitled to it to the same extent as he.

And we find that the authorities bear us out in this view to a considerable extent. True, this view does not seem to be supported by the case of *Duffies* v. *Duffies,* 76 Wis., 374, or by the case of *Doe* v. *Roe,* 82 Me., 503, or by the early case of *Logan* v. *Logan,* 77 Ind., 558. But it is supported by so many cases that we shall refer merely to the monographic note to the case of *Clow* v. *Chapman,* 125 Mo., 101, found in 46 Am. St. Rep., 474.

It might be particularly interesting to refer to the case of *Bennett* v. *Bennett,* 116 N. Y., 584, in which the court says (page 590):

"The actual injury to the wife from the loss of consortium, which is the basis of the action, is the same as the actual injury to the husband from that cause. * * * The rights of the one and the obligations of the other spring from the marriage contract, are mutual in character, and attach to the husband as husband and to the wife as wife. Any interference with these rights, whether of the husband or of the wife, is a violation not only of a natural right, but also of a legal right arising out of the marriage relation."

In the case of *Foote* v. *Card,* 58 Conn., 1, the court says:

"It is not a prerequisite to the right of the plaintiff to maintain this suit in her own name that she should have been abandoned by her husband in the literal sense, nor that she should have actually separated herself from him by or without a decree of divorce. If she has suffered the wrong complained of, her right to redress is absolute; it can not be made to depend upon any of these conditions. As long as she keeps her marriage contract, so long she has the right to the conjugal society and affection of her husband. Possibly she may regain these. This possibility is her valuable right. The defendant may not demand that she shall sacrifice it for the future as the price of redress for injuries in the past."

It would seem to us that a contrary view would necessitate a disregard of the entire similarity of rights of the husband and

wife and a retroversion from the progress of the past. We are not so jealous of the privileges bestowed upon husbands by the common law, nor so insensible to the spirit of the times, as to adopt such views.

Counsel for defendant, who has apparently made an exhaustive search of the authorities has laid particular stress upon the cases of *Whitman* v. *Egbert*, 50 N. Y. Supp., 3, and *Van Olinda* v. *Hall*, 34 N. Y. Supp., 777. The former decides merely that it is not enough to show that plaintiff's husband abandoned her for defendant if there is no evidence that defendant, by her acts or words, encouraged him to do so; and the latter decides that, there being no evidence of any influence, proper or otherwise, to alienate plaintiff's husband, and no evidence of any illicit relations between them, a verdict for plaintiff could not stand. And the fact that this court deliberately uses the expression "alienate the husband," sufficiently justifies the use by the plaintiff in this case of the same expression, however distasteful it may be to counsel for defendant.

Demurrer overruled.